UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.

ONYANGO CASANOVA CULP,

       Defendant.
_____/

Case No. 1:12-cr-24

HON. JANET T. NEFF

## **OPINION**

A January 24, 2012 two-count Indictment charges Defendant with (1) Possession with Intent to Distribute Heroin (one kilogram or more), 18 U.S.C. §§ 841(a)(1), (b)(1)(A)(i); and (2) Possession with Intent to Distribute Cocaine (500 grams or more), 18 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii). The charges stem from four kilo "bricks" of heroin and cocaine found in a trap compartment of Defendant's vehicle after a traffic stop on I-94 in Michigan.

Before the Court is Defendant's Motion to Suppress Evidence (Dkt 17), seeking the suppression of the drug evidence. The Government has filed a Response in opposition (Dkt 20). On April 3, 2012, the Court heard oral argument on the motion. For the reasons that follow, Defendant's Motion to Suppress is granted.

### I. Facts[1]

On September 27, 2011 around 1:40 p.m., Defendant was traveling eastbound on I-94 in Van Buren County in a 1999 Mercury Mountaineer when he was stopped by Michigan State Police

---

[1] Given the nature of the evidence of the traffic stop, i.e., digital recordings, the Court has relied in large part on Defendant's detailed recitation of facts, which the Government has not challenged, and the Court finds comports with its viewing of the recordings.

Trooper James Gillespie for an alleged traffic violation of "following too closely." Gillespie was working on road patrol on I-94 in a marked Michigan State Police vehicle and was headed westbound. He pulled into an emergency turnaround in the median, and saw Defendant's Mercury Mountaineer pass eastbound on I-94. Gillespie determined that the Mountaineer was following another vehicle, an otherwise unidentified car, "dangerously close," constituting a "following too close violation" under Michigan law, MICH. COMP. LAWS § 257.643(1).

Gillespie proceeded out of the turnaround and east in the left lane of I-94. He followed Defendant for about eight miles before stopping him. At the time of the stop, Defendant was driving in the right lane behind a semi-truck, a different vehicle from the one Gillespie first observed defendant following.[2] Gillespie estimated that Defendant's vehicle was about twenty feet from the back of the truck. Before stopping Defendant, Gillespie pulled alongside the Mountaineer in the left lane, purportedly to determine if Defendant was wearing a seat belt before he made the stop. Gillespie then dropped back behind Defendant's vehicle and activated his overhead lights. Defendant immediately pulled to the side of the expressway and stopped. When Gillespie activated the overhead lights, it automatically activated the video camera mounted on his dashboard, recording the entire stop.[3]

Gillespie approached the passenger side of the vehicle, explained why he had stopped Defendant. After obtaining Defendant's driver's license, registration and insurance, Gillespie returned to his vehicle and had a LIEN check run to see if there were any outstanding warrants for

---

[2]Gillespie not only could not identify anything about the first vehicle, he had no idea when or at what point Defendant ceased to follow it or whether the car exited the highway.

[3]Additionally, Gillespie had a "Scorpion Camera" attached to his shirt pocket that he manually activated, which also recorded the events at issue.

Defendant. There were none; however, dispatch informed Gillespie that Defendant had a CCW permit that had expired.

At that point, Gillespie decided he would not issue a ticket to Defendant, but would only give him a verbal warning. Gillespie returned to Defendant's vehicle, this time on the driver's side, and although it was raining, asked Defendant to step out of the vehicle. Defendant complied. Gillespie led Defendant to the rear of the vehicle where he informed Defendant he was only issuing him a verbal warning, and returned his driver's license, registration and insurance.

Gillespie then began to question Defendant about miscellaneous matters surrounding his residency, family and travels, and particularly, the expiration of his CCW permit. Defendant fully responded to the questions and was cooperative. Defendant explained that he did not renew the permit because he did not have the money. Gillespie then asked if he had his weapon on him, and Defendant answered that he did not. Gillespie continued to question Defendant, asking whether he brought any liquor or fireworks into Michigan since he was coming from Indiana, and asking whether Defendant had a weapon in the vehicle. Defendant responded in the negative to these questions. Rain continued to fall throughout the questioning, and in fact, intensified.

Gillespie then asked Defendant for permission to search the vehicle to see if there was a weapon in the car, and Defendant responded, "That's up to you, sir." Gillespie did not search the vehicle at that point and subsequently again asked Defendant for permission to search the vehicle. Defendant repeated, "It's up to you, sir." Gillespie conducted a pat-down of Defendant for weapons, finding none. Gillespie removed Defendant's wallet and directed him to go have a seat in another marked police vehicle that had arrived, driven by Trooper Bawks.

Gillespie proceeded to search Defendant's vehicle. During the search, Gillespie noticed that the carpet in the cargo area was "slightly crinkled" where the side panel plastic molding meets the floor, which he found suspicious. Gillespie pulled up the carpet and the padding and saw a cut in floor for a trap door, through which he could see a package he suspected contained drugs.

Gillespie handcuffed Defendant and placed him under arrest in Bawks' vehicle. Defendant's vehicle was transported to Spike's Garage in Mattawan, about three miles from the traffic stop, where police officers opened the trap with the use of a portable drill to remove screws from hinges on the trap door. This process was video taped and photographed. Inside the trap compartment were four taped kilo-sized packages. A subsequent analysis of the packages showed two contained heroin and two contained cocaine.

Defendant now seeks suppression of the drugs based on alleged violations of the Fourth Amendment during the traffic stop.

## II. Legal Standards

"The Fourth Amendment of the United States Constitution guarantees the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Copeland,* 321 F.3d 582, 592 (6th Cir. 2003) (quoting U.S. Const., amend. IV). "The temporary stop and detention of a vehicle and its passengers, even for a brief period of time, can constitute an unlawful 'seizure' under the Fourth Amendment." *Id.* (citing *Delaware v. Prouse,* 440 U.S. 648, 653 (1979) (stopping an automobile and detaining its occupants constitute a "seizure" under the Fourth Amendment even though the purpose of the stop is limited and the resulting detention quite brief)).

"[A] police officer's stop of a vehicle is 'subject to the constitutional imperative that it not be 'unreasonable' under the circumstances.'" *Copeland,* 321 F.3d at 592 (quoting *Whren v. United States,* 517 U.S. 806, 810 (1996). That is, the government interests in conducting the stop must outweigh the individual privacy interests. *Id.* "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren,* 517 U.S. at 810. The constitutional reasonableness of a traffic stop turns not on the police officer's subjective intent, but rather on objective fact.[4] *Id.* at 813.

"A police officer legally may stop a car when he has probable cause to believe that a civil traffic violation has occurred." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008); *see also Copeland,* 321 F.3d at 592. "Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." *Blair*, 524 F.3d at 748.

Nonetheless, "where an officer is in possession of information that creates the basis for probable cause, he is required to act upon this information within a reasonable period of time—otherwise the existence of probable cause is said to have become stale." *Copeland,* 321 F.3d

---

[4]In this case, Defendant has emphasized that he is African American and he has intimated that it was only after discovering Defendant's race that Gillespie chose to stop Defendant's vehicle on the purported violation of "following too closely." Whether Defendant's race played any role in Gillespie's decision to stop Defendant's vehicle is irrelevant to the Fourth Amendment analysis. The constitutional reasonableness of traffic stops does not depend on the actual motivations of the individual officers involved. *Whren,* 517 U.S. at 813. Although "the Constitution prohibits selective enforcement of the law based on considerations such as race, . . . the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id; but see United States v. Hill,* 195 F.3d 258, 267 (1999) (noting "the concern that police officers are using the state of the law in this Circuit [based on *Whren*] as carte blanche permission to stop and search 'target' or 'profile' vehicles for drugs" and that "it is the responsibility of the courts to make sure that police officers act appropriately and not abuse the power legally afforded to them by, among other things, carefully scrutinizing a police officer's testimony as to the purpose of the initial traffic stop").

at 594. "Whether the facts creating the basis for probable cause have become stale is directly related to the nature of those facts." *Id.* Logically, an officer who has observed a traffic violation must effect a stop based on this conduct within a reasonable time. *Id.*

Further, "'a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.'" *United States v. Everett,* 601 F.3d 484, 494 (6th Cir. 2010) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Thus, even if initially lawful, a traffic stop may evolve into an unlawful seizure if the execution of the traffic stop fails to comply with the standard for temporary detentions set forth in *Terry v. Ohio*, 392 U.S. 1 (1968) and its progeny.[5] *Everett,* 601 F.3d at 488 n.4 (noting that the Sixth Circuit Court of Appeals' unqualified holding that even where probable cause existed for a traffic stop, the stop was governed by *Terry*, although the Supreme Court has never squarely addressed this issue).

In *Everett*, the Sixth Circuit addressed as a matter of first impression "when, if ever, may an officer conduct questioning during a traffic stop that (1) is unrelated to the underlying traffic violation, (2) is unsupported by independent reasonable suspicion, and (3) prolongs the stop by even a small amount?" 601 F.3d at 486. Reviewing the contours of previous case law, the court relied on the fundamental *Terry* analysis to forge a "reasonable diligence standard" to determine whether an officer has violated the Fourth Amendment by extending the duration of traffic stop to ask questions. *United States v. Fields,* No. 3:09cr029(1) & (2), 2010 WL 2294314, at *1 (S.D. Ohio

---

[5]*Terry* provides a limited exception to the normal requirements of probable cause, and permits a police officer briefly to detain a person or property for investigative purposes if the officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur …. *United States v. Flores,* 571 F.3d 541, 544 (6th Cir. 2009); *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005).

June 4, 2010). The court rejected any bright-line "no-prolongation" rule to determine the limits of police questioning during a traffic stop. *Everett,* 601 F.3d at 491. "Rather, because the touchstone of any Fourth Amendment analysis is reasonableness, we must conduct a fact-bound, context-dependent inquiry in each case." *Id.* at 493-94. "[T]he proper inquiry is whether the 'totality of the circumstances surrounding the stop' indicates that the duration *of the stop as a whole*—including any prolongation due to suspicionless unrelated questioning—was reasonable." *Id.* at 494 (emphasis in original).

The court relied on Supreme Court precedent as the basis for a reasonable diligence standard:

> The Supreme Court has provided some abstract guidance, noting that "[i]n assessing whether a [stop] is too long in duration ..., we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly...." [*United States v.*] *Sharpe,* 470 U.S. [675,] 686, 105 S. Ct. 1568 [(1985)]. In other words, the overarching consideration is *the officer's diligence*—i.e., his "persevering" or "devoted ... application to accomplish [the] undertaking" of ascertaining whether the suspected traffic violation occurred, and, if necessary, issuing a ticket. Webster's Third New International Dictionary Unabridged (1981) at 633. The question of the officer's diligence, as with so much else in the Fourth Amendment context, is "determine[d] ... under the totality of the circumstances...." *United States v. Fountain,* 2 F.3d 656, 665 (6th Cir. 1993), overruled in part on other grounds by *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997).

*Everett,* 601 F.3d at 494.

The court further explained:

> Because the reasonable diligence standard does not "require[an officer] to move at top speed," here, too, some amount of questioning is permissible—so long as the officer's overall course of action during a traffic stop, viewed objectively and in its totality, is reasonably directed toward the proper ends of the stop. By contrast, if the totality of the circumstances, viewed objectively, establishes that the officer, without reasonable suspicion, definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation, this would surely bespeak a lack of diligence. So, too, if the circumstances establish that, over the course of the entire stop, "questions unrelated to the traffic violation constituted the bulk of the interaction between the trooper and the [motorist]."[12]

7

> 12. Importantly, it is the objective conduct of the officer which the diligence standard measures; his subjective intent or hope to uncover unrelated criminal conduct is irrelevant. *See Whren,* 517 U.S. at 813, 116 S. Ct. 1769.

*Everett,* 601 F.3d at 495 (citations omitted).

"[I]n evaluating whether an officer's prolongation of a traffic stop through extraneous questions indicates a lack of diligence, the *subject* of those questions, no less than their quantity, is part of the 'totality of the circumstances' of the stop, and is therefore a relevant consideration." *Id.* at 494 (emphasis in original). Courts have permitted certain locomotion-related questions, such as those relating to travel history and plans. *Id.* at 494. Further, because "'the safety of the officer'" during a traffic stop is a "'legitimate and weighty interest,'" officers conducting a traffic stop may inquire about weapons. *Id.* at 494-95 (quoting *Pennsylvania v. Mimms,* 434 U.S. 106, 110 (1977)). In any event, the diligence inquiry must focus only on the objective conduct of the officer and any subjective intent or hope to uncover unrelated criminal conduct is irrelevant. *Id.* at 495 n.12.

Finally, "[b]ecause the government often asserts that a defendant consented in cases 'where the police have some evidence of illicit activity, but lack probable cause to arrest or search,' *Schneckloth* [*v. Bustamonte,* 412 U.S. 218, 227 (1973)], [the courts] carefully examine the government's claim that a defendant consented." *United States v. Worley,* 193 F.3d 380, 386 (6th Cir. 1999). "[N]ot any type of consent will suffice, but instead, only consent that is 'unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion.'" *Id.* (quoting *United States v. Tillman,* 963 F.2d 137, 143 (6th Cir. 1992)).

"The determination of whether consent was valid is a fact-specific inquiry that must be determined by the totality of the circumstances." *Worley,* 193 F.3d at 386. The court should examine, among other factors: "the age, intelligence, and education of the individual; whether the

individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." *Id.*

If the police conduct violated the Fourth Amendment, then all that followed is suppressible as "fruit of the poisonous tree." *Everett,* 601 F.3d at 491 n.7 (citing *Wong Sun v. United States,* 371 U.S. 471 (1963)).

### III. Analysis

Defendant argues that the warrantless stop, subsequent detention, and search and seizure were unlawful and in violation of his Fourth Amendment rights on seven grounds: (1) the traffic stop was not valid; (2) the detention after the traffic stop was unlawful; (3) any alleged consent was vitiated by the unlawful stop and subsequent detention; (4) there was no valid consent-in-fact because it was not specific and unequivocal; (5) the alleged consent was not voluntary; (6) the scope of the search of the vehicle exceeded the asserted consent; and (7) the search of the hidden compartment without a warrant was unlawful. Defendant argues therefore that the seizure of the drugs, being the fruits of the unlawful conduct, should be suppressed pursuant to *Wong Sun,* 371 U.S. at 488.

Having fully considered the governing legal principles, set forth in detail above, the Court concludes that the law enforcement action resulting in the discovery of the drug evidence in this case is vulnerable on three key grounds under Fourth Amendment analysis, and ultimately succumbs to the taint of unreasonableness. Accordingly, the search of the vehicle and seizure of the drugs was illegal, and the evidence must be suppressed.

A. The Traffic Stop

The parties dispute whether Gillespie had probable cause to stop Defendant's vehicle on a "following too close" violation under MICH. COMP. LAWS § 257.643. Section 257.643(1) provides: "The driver of a motor vehicle shall not follow another vehicle more closely than is *reasonable and prudent*, having due regard for the speed of the vehicles and the traffic upon, and the condition of, the highway" (emphasis added). As a preliminary matter, the parties dispute the validity of the statute and the discretionary nature of any law enforcement determination of a violation. Defendant argues that the statute is ambiguous and vague and is dependent on one's perception of a number of conditions, and unlike absolute traffic laws, compliance is a matter of interpretation and discretion. The government responds by citing various sources of state, federal and other guidelines for calculating safe travel distances between motor vehicles. The Court finds it unnecessary to resolve these disputes over matters of state law interpretation and discretionary law enforcement action. Even if Gillespie had probable cause to believe Defendant violated § 257.643 by "following too closely" at the time he passed Gillespie in the emergency turnaround, that probable cause had become stale by the time Gillespie decided to stop Defendant some eight miles later.[6]

Gillespie testified that he stopped Defendant because he was following the vehicle ahead of him, an unknown car, too closely and it was dangerous—dangerous to Defendant and others driving on the highway (Tr. 12/6/11, Dkt 20-2 at 8-9). Nonetheless, Gillespie waited eight miles before

---

[6]The parties agreed this motion should decided based on the testimony established in the state court record. The Court notes that the testimony contains some discrepancies as to the specific facts, such as the distance Gillespie followed Defendant before stopping him. The Court has endeavored to rely on the record as a whole, including the transcripts, oral argument, the video/audio recordings of the traffic stop and the search, and photographs in evidence, to resolve this motion on the generally-agreed upon facts.

stopping Defendant who was by then following a different vehicle altogether. In the Court's view, these circumstances undermine any asserted probable cause for the stop. Although Gillespie testified that Defendant was following a semi-truck too closely immediately before the stop, the fact remains that the primary basis for the stop and the alleged violation that Gillespie asserted for the stop, was the violation that occurred as Defendant's vehicle passed Gillespie while he was in the median turnaround. Under these circumstances, any argument that the later violation "refreshes" the probable cause from the primary violation or is new probable cause, to avoid staleness, stretches the probable cause analysis beyond any semblance of a meaningful legal test. Thus, the Court concludes that the asserted probable cause for the traffic stop did not exist, and therefore the traffic stop was unlawful and is grounds for suppression of the drug evidence.

B. Reasonableness of the Detention

As a second and altogether separate basis for suppressing the evidence, the Court concludes that the scope of the detention was unreasonable and a violation of the Fourth Amendment. As noted above, the Sixth Circuit has acknowledged that in conjunction with a traffic stop, a police officer may ask questions unrelated to the underlying traffic violation, including whether the person being questioned has a dangerous weapon. *Everett,* 601 F.3d at 494-95*; see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (questions asked by law enforcement may extend beyond the mere purpose of the stop). The Court must consider the reasonableness of the detention under the "reasonable diligence standard" announced in *Everett,* 601 F.3d at 495, based on an objective view of the totality of the circumstances.

Here, the unfolding of the circumstances makes the detention much more akin to a prolonged investigatory expedition with the singular mission of searching Defendant's vehicle than a

permissible course of action reasonably directed toward the proper ends of the stop. The parties agree that the purpose of the traffic stop was concluded, at the latest, once Gillespie made the decision to only give Defendant a warning and not issue him a ticket, and so informed Defendant, returning his belongings, and asked Defendant if he had any questions. It was only after that point, that Gillespie embarked on an extensive course of investigation and questions aimed at conducting a search.

The government argues that Gillespie's course of questioning, after the traffic stop effectively concluded, was merely a consensual encounter, and Defendant's decision to remain and answer the questions was voluntary, and thus does not offend the constitutional imperatives of the Fourth Amendment. The Court disagrees.

Although Gillespie testified that he had already decided not to issue Defendant a ticket for "following too closely" and only give him a warning, he nonetheless returned to the driver's side of Defendant's vehicle, directed Defendant to get out of the car and had him move to the back of the vehicle, where he was further detained while Gillespie pursued a mission entirely separate from the underlying traffic violation. It is clear from the video recording that Defendant remained there, standing in the rain, at Gillespie's behest, and would not have thought he was free to leave. Certainly, had Defendant believed that this was a mere consensual encounter at this point, he would not have remained in the pouring rain, in his shirt sleeves, while Gillespie ambled on with questions.

As the Sixth Circuit noted in *Everett*, "the touchstone of any Fourth Amendment analysis is reasonableness." 601 F.3d at 494. The Court "must conduct a fact-bound, context-dependent inquiry in each case." *Id.* Having fully considered the circumstances as they unfolded during the stop, as viewed on the video recordings, in conjunction with Gillespie's testimony, the Court finds

no acceptable purpose for Gillespie's extended detention and prolonged questioning of Defendant, pat-down, and persistent requests to search the vehicle, all after the purpose of the traffic stop had undisputedly ended.

## C. Consent

Defendant advances a number of arguments with regard to consent. The Court concludes on the facts presented that there was not valid consent-in-fact because it was not unequivocal and specific.

The government contends that Defendant expressly consented to the search of his vehicle. "[I]t is the [g]overnment's burden, by a preponderance of the evidence, to show through 'clear and positive testimony'" that valid and voluntary consent to a search was obtained. *Worley,* 193 F.3d at 385 (citation and quotations omitted). In his extended questioning of Defendant after he informed Defendant he was not issuing him a ticket, Gillespie asked Defendant for permission to search the vehicle. The following colloquy, as set forth by the government, occurred:

> TROOPER: Can I search your car?
> DEFENDANT: It's up to you, sir. (Gesturing towards car)
> TROOPER: I would like to search your car, I mean, you say you don't have your gun with you, I just want to make sure – is that true?
> DEFENDANT: That's true.
> TROOPER: Okay. Is that Okay?
> DEFENDANT: It's up to you, buddy. (Gesturing with both hands towards officer.)
> TROOPER: Okay, okay. Can I search you quick?
> DEFENDANT: Sure. (Defendant then consents to a pat down search of his person.)

(Govt. Br., Dkt 20, at 6 n.3).

As noted above, the question of consent is a fact-specific inquiry that must be determined by the totality of the circumstances. *Worley,* 193 F.3d at 386. "[N]ot any type of consent will suffice, but instead, only consent that is 'unequivocally, specifically, and intelligently given,

13

uncontaminated by any duress and coercion.'" *Id.* (quoting *Tillman,* 963 F.2d at 143).

Viewing the totality of the circumstances, the Court concludes that Defendant's responses do not constitute valid consent to search. Defendant was clearly being detained, standing in the rain, while Gillespie continued extensive questioning of him. Defendant's manner and oral responses to Gillespie's questions were cooperative in nature, and the responses to Gillespie's requests for permission to search must be considered in that same vein. Defendant offered no resistance and his responses effectively indicated that the officer could, and likely would, make the choice whether to search. Defendant had been detained for some time at this point, and although Gillespie had already informed him that he was giving him only a warning and no ticket, Gillespie continued on a course of purposeful investigation. These circumstances do not support a conclusion that Defendant was unequivocally and specifically consenting to a search.

Defendant's statements, "It's up to you," constitute nothing more than mere acquiescence to authority and a cooperative demeanor in a coercive context—being detained for an extended period on the shoulder of the expressway, standing in the rain. "'[A] search based on consent requires more than mere expression of approval to the search.'" *Worley,* 193 F.3d at 386 (quoting *United States v. Jones,* 641 F.2d 425, 429 (6th Cir.1981)). This is born out in the above colloquy. When asked for permission to be personally searched, Defendant affirmatively responded, "Sure" in contrast to his response to search the vehicle. Moreover, as Defendant points out, had Gillespie himself interpreted Defendant's response to be express consent, he would not have asked for permission to search a second time.

In conducting the consent analysis, the Court must take into consideration subtly coercive police questions as well as the possibly vulnerable state of the person who consents. *Worley,* 193

F.3d at 386 n.10 (citing *Schneckloth,* 412 U.S. at 229). Consent may be involuntary even when only subtle or implicit forms of coercion are present. *Id.*

The government has failed to meet its burden of showing through "clear and positive testimony" a valid and voluntary consent to a search. *See Worley*, 193 F.3d at 385. Absent a valid consent to search, the warrantless search of Defendant's vehicle was illegal, and the evidence of the drugs must be suppressed on this ground in addition to those above, pursuant to *Wong Sun,* 371 U.S. at 488. *See Everett,* 601 F.3d at 491 n.7.

## IV. Conclusion

The constitutional rights of criminal defendants are granted to the innocent and the guilty alike. *See Stone v. Powell,* 428 U.S. 465, 490 (1976). Whether the discovery of the illegal drugs in this case was the result of Gillespie's instinct, serendipity or some other fortuitous insight is not known. But based on the record, the discovery did not result from a course of law enforcement action justifiable under the Fourth Amendment.

Defendant's Motion to Suppress is granted. The evidence of the drugs is properly suppressed as a result of the illegal search and seizure.

An Order consistent with this Opinion will be entered.


DATED: April 20, 2012                         /s/ Janet T. Neff
                                                                    JANET T. NEFF
                                                                    United States District Judge